# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**ESTATE OF SIAVASH BAYANI** (Deceased) and **FATEMEH BAYANI**, (Wife of Deceased)
c/o Zohreh Mizrahi, Esq.
2049 Century Park East, Suite 2680
Los Angeles, CA 90067

**BABAK BAYANI**

**BANAFSHEH BAYANI**

**and John Doe**, inclusive,
Plaintiffs,

v.

**THE ISLAMIC REPUBLIC OF IRAN**
Ministry Of Foreign Affairs
Ebn-e-Sina St., Emam Khomeini Sq.
Tehran, Iran

**THE IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY**
Ministry Of Foreign Affairs
Ebn-e-Sina St., Emam Khomeini Sq.
Tehran, Iran

**THE ISLAMIC REVOLUTIONARY GUARD CORPS (RGC)**
Ministry Of Foreign Affairs
Ebn-e-Sina St., Emam Khomeini Sq.
Tehran, Iran

**ALI AKBAR HASHEMI RAFSANJANI**
Ministry Of Foreign Affairs
Ebn-e-Sina St., Emam Khomeini Sq.
Tehran, Iran

**ALI AKBAR FALLAHIAN KHUZESTANI**
Ministry Of Foreign Affairs
Ebn-e-Sina St., Emam Khomeini Sq.
Tehran, Iran,

Case No.

**COMPLAINT**

**AYATOLLAH ALI KHAMENEI** )
Supreme Leader of Iran )
Ministry Of Foreign Affairs )
Ebn-e-Sina St., Emam Khomeini Sq. )
Tehran, Iran )
)
and **JOHN DOES** 1-10 inclusive, )
Defendants. )

# Complaint for Declaratory Relief

COMES NOW Plaintiff The Estate of Siavash Bayani, Fatemeh Bayani, and members of the Bayani family, herein and for their cause of action against Defendant, The Islamic Republic of Iran, et. al. For security purposes, the address for lead Plaintiff Bayani is "c/o" attorney Zohreh Mizrahi, esq. For their complaint, Plaintiffs allege and state as follows:

## I.

## STATEMENT OF THE FACTS

1. This case arises from the arrest, imprisonment, torture and murder of Siavash Bayani (hereinafter referred to as "Decedent") at the hands of the Islamic Republic of Iran and its agents in 1995, 1996 and 1997.

2. Decedent Siavash Bayani and Decedent's spouse, Plaintiff Fatemeh Bayani, were born in Iran. Decedent was born on August 1, 1937 and Plaintiff Ms. Bayani was born on November 24, 1945. They were married in Tehran, Iran on October 18, 1963 and subsequently had two children, Banafsheh Bayani (d.o.b. May 3, 1968) and Babak Bayani (d.o.b. August 26, 1974).

3. Decedent, after completing his studies in Iran and the United States became an officer in the Iranian Air Force under the Pahlavi's Dynasty (before its overthrow by the Islamic Revolution in 1979). Decedent was a radar operator, and was stationed in the Central Radar base in Tehran for fourteen years. Decedent quickly rose to the rank of captain, and earned many commendations.

4. In 1976, Decedent and his family were sent to the U.S. by the Iranian government for a seven-month management. training course at the Squadron Officer School at the U.S. Air Force base in Montgomery, Alabama. Upon his return, Decedent was promoted.

5. Three years later, in 1979, Decedent was sent to the U.S. as a Liaison Officer, in charge of supervising students studying at Oceana Naval Air base in Virginia Beach, Virginia. Decedent's wife and two minor children again accompanied him. They were all in the United States when the Islamic Revolution ousted the Shah's regime.

6. Upon their return to Iran in 1979, Decedent's home, which was provided by the Shah's government, had been taken over by an Islamic cleric working for the revolutionary government. Without a home, Decedent and his family were forced to move in with Decedent's parents.

7. Under the new government, Decedent found that while he was able to keep his rank, he had far less authority and his duties were more of an instructional nature. It quickly became apparent that Decedent was not trusted by the new regime. As an officer under the Shah's government for nearly thirty years, Decedent was seen as a potential threat.

8. Soon after the Iran-Iraq War in 1981, the Islamic government began purging the military of those officers who served under the Shah's government. Soldiers of the Revolutionary Guard Corps RGC), under the direction of the Ministry of Intelligence and Security (MOIS) and upon the orders of the Islamic Republic of Iran, began rounding up and executing the top military officers whom previously had served under the Shah's regime.

9. As many officers were summarily arrested and executed systematically by the Islamic Government based on the ranks of officers, Decedent, who by that time had attained the rank of full colonel, watched in horror as his fellow officers were arrested without warning, without warrant, and then, without benefit of a trial, were sentenced to death as traitors and spies.

10. Due to the pending Iran-Iraq War and the lack of qualified personnel, Decedent was used on a limited basis to train new officers.

11. In 1984, after an extensive cleansing process and receipt of clearance, fearing that his arrest and execution would be imminent, Decedent and his family left Iran via legal channels and sought asylum in the United States. They were granted asylum in the United States later in 1984.

12. The Decedent's family lived briefly in Philadelphia and later moved to Los Angeles, California, where decedent worked as a maintenance repairman at a local Holiday Inn.

13. Around 1990, Decedent was hired by the Litton Corporation, where he worked in the replacement parts department.

14. Around 1994, Decedent's mother became gravely ill and in dire need of immediate care for leukemia. Decedent began making inquiries with old colleagues and friends in Iran to determine whether it would be safe for him to return to Iran.

15. On October 20, 1994, Decedent and Plaintiff Fatemeh Bayani became naturalized United States citizens. Having been assured of a safe return, they began to make plans to return to Iran to take care of Decedent's ill mother.

16. In early 1995, Decedent received a letter from Mr. Karimi, a friend he had contacted in Iran, informing him that the Iranian government was giving amnesty to all those who served in the military under the Shah's regime. The letter assured Decedent that he could safely return, without the fear of government reprisals.

17. Decedent and Plaintiff Fatemeh Bayani returned to Iran on February 2, 1995. Immediately upon arrival at the airport in Tehran, Decedent encountered problems. Decedent and his wife carried U.S. passports as well as their Iranian passports. They told the government officials that they were U.S. citizens and each showed them both of their Iranian and U.S. passports.

18. After a lengthy inspection and interview, Plaintiff Fatemeh Bayani was handed back her passports and was told she could go. Decedent's passports and all identification

documents, however, were confiscated by the Iranian government officials. Decedent was advised that he was subject to a "routine" secondary inspection, and was asked to provide an address where he could be contacted while in Iran. Decedent was not told when, or how, he could have his passports returned.

19. While taking care of his mother, Decedent also began contacting friends and old colleagues in an attempt to find work using his fluency in English and Farsi and his technical background. Decedent was repeatedly told by potential employers that it would be dangerous for them to hire him, given his connections to the Shah's regime and the United States. Moreover, Decedent was warned that it was not safe for him and that he should return to the United States as soon as possible.

20. One day, after being in Iran a little more than five months, Decedent returned from a job interview and told his wife, Plaintiff Fatemeh Bayani, to return to the United States immediately. He did not explain in detail, but informed her that it was now very dangerous for them to remain in Iran.

21. Decedent was to stay behind and try to retrieve his passports, but he insisted that his wife leave on the next available flight and take care of their children. With much difficulty, Plaintiff Fatemeh Bayani was able to find an Alitalia flight from Tehran to Rome, then to New York and Los Angeles. She boarded the flight without her husband, and returned to the United States.

22. Less than twenty-four hours later, Decedent was arrested by agents of the Islamic Republic of Iran, the infamous soldiers of Imam-e-Zaman and imprisoned.

23. For more than a year, Decedent was not able nor allowed to contact his family either in Iran or the United States.

24. Finally, in August 1996, on his son Babak's 22nd birthday, Decedent was allowed to phone his family. Decedent was surrounded by guards, and had to speak in code words. Through the eight to ten minute conversation, Decedent made it clear that he had been arrested, that he had been tortured and that it was not safe for his wife to return to Iran.

25. The conversation was ended, however, when the phone was taken out of Decedent's hands by an apparent interrogator who got on the line. The interrogator told Plaintiff Fatemeh Bayani that there were a few issues that needed to be cleared up, and that if she returned to Iran, these things could be taken care of and her husband would be released. Mrs. Bayani understood that this was a clear attempt to lure her to Iran, just as had been done to them a few years earlier.

26. After the phone call, five or six months later, Decedent was allowed to write letters to his family. Each time, the letters sounded cheerful, but contained coded messages letting them know he was being tortured and denied food.

27. A few months after the phone call, officials of the Islamic Republic of Iran contacted Decedent's mother and offered to help gain Decedent's release in exchange for thousands and thousands of U.S. dollars.

28. Out of desperation, Decedent's mother and Plaintiff Fatemeh Bayani began paying bribes to government officials, in an attempt to at least visit Decedent. Plaintiff Fatemeh Bayani sent the family's life savings, took the maximum amounts from all their credit cards, and even took loans from friends, over $95,000.00 total, and sent it to Decedent's mother to try to gain access to him.

29. Finally, about four months after his first phone call, Decedent's mother was allowed to visit him. According to his mother, Decedent had lost nearly half his normal weight, and his body was covered in bruises.

30. The letters continued, each containing coded messages sounding more desperate than the last. Finally, a letter from Decedent to his wife, Plaintiff Fatemeh Bayani, in August 1997 gave the impression that Decedent knew he was about to be executed. In the Letter, Decedent professed his innocence of any wrongdoing, praised his wife and children for "taking care of our life" while he was imprisoned, and finally by asking his wife to,

> "pretend that I was killed in the war between Iran and Iraq, and that you are the one who has to take this broken ship to the shore. And you have to do it without me."

31. Only a few weeks later, Decedent's mother-in-law received a phone call from an Iranian government official, notifying her that Decedent had been taken to a remote area and hung by the neck until dead.

32. Eleven days later, the official Iranian government newspaper *Sallam* reported that Decedent was executed as a spy for the "Great Satan", the United States and had worked as an agent for the U.S. Central Intelligence Agency (CIA).

33. Decedent was never employed by the CIA or any other U.S. government agency. Before seeking asylum in the United States, Decedent's only contact with the American government had been for training or as part of his duties as liaison officer in the Iranian Air Force. Decedent never received money from the U.S. government for information about the Islamic regime in Iran or any other services.

34. Compounding this terrible tragedy, two days before he was executed, Decedent's mother passed away. The family takes solace in the fact that she was spared the horror of knowing that her son had been executed.

35. The Islamic Republic of Iran denied Decedent a proper burial. After bribing numerous officials with many thousands of dollars in U.S. currency, Decedent's family was able to retrieve his body and give him a proper religious burial.

36. Back in the United States, the family was devastated.

37. Decedent's daughter, Banafsheh, was so emotionally affected that she began receiving psychiatric treatment. Even today, over eight years later, Ms. Bayani is still being treated for the trauma caused by her father's execution. Banafsheh had to also continue being the sole breadwinner of the family and was the co-signer on over $163,000.00 in school loans and expenses.

38. Decedent's son, Plaintiff Babak Bayani, was similarly affected by his father's execution. To honor his father's memory, Babak changed career paths and is studying to become a pilot. Often times, however, he becomes so emotional over his

father's memory that his instructors made him stop the training in order to regain his composure.

39. Plaintiff Fatemeh Bayani was completely devastated by her husband's arrest, imprisonment, torture and eventual execution at the hands of the Islamic Republic of Iran. Ms. Bayani and the Decedent had been married for over thirty-four years at the time he was executed. Decedent was her husband, protector, mentor father to her children, and her soul mate.

40. Moreover, having spent the family's entire savings on trying to gain Decedent's release, Plaintiff Fatemeh Bayani had no financial support once her husband was executed. Ms. Bayani receives support from her daughter and, for a short while, went on public assistance in order to pay the family's expenses.

41. Plaintiff Fatemeh Bayani and her family have been irreparably harmed and have suffered extreme hardship at the hands of Defendants.

## II.
## PARTIES

42. **Plaintiff Estate of Siavash Bayani** represents the estate of Siavash Bayani, a United States Citizen who was lured to Iran and then imprisoned, tortured and murdered by agents of the Iranian government.

43. **Plaintiff Fatemeh Bayani**, a United States citizen, is the widow of Decedent Siavash Bayani, and the executor of his estate.

44. **Plaintiff Babak Bayani** , a United States Citizen, is the son of Decedent Siavash Bayani.

45. Plaintiff **Banafsheh Bayani**, a United States Citizen, is the Daughter of Decedent Siavash Bayani.

46. **Plaintiffs John Doe Qualifying Family Members** are parties who were injured by the imprisonment, torture and execution of Decedent Siavash Bayani.

47. **Defendant The Islamic Republic of Iran**, is a foreign sovereign state within the meaning of 28 U.S.C. §1603, and has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)). Defendant Islamic Republic of Iran's activities were outside the scope of immunity as provided by the Foreign Sovereign Immunities Act.

48. **Defendant The Iranian Ministry of Intelligence and Security (MOIS**) ("*Vezarat-i Ettelaat va Amniyat-i Keshvar"*) was created in 1984 and at all times relevant hereto was the Iranian intelligence service responsible for actions which caused Decedent's arrest, detention, torture, and ultimately his execution.

49. **Defendant Revolutionary Guard Corps** ("*Pasdaran-i Inqilab-i Islami*") (Hereinafter referred to as "RGC") was established under a decree issued by Ayatollah Khomeini on May 5, 1979. The "Pasdarans", as they are known, are the guardians of the Revolution itself, and carry out orders of Defendant Islamic Republic of Iran in the enforcement of its codes and morality. Within the scope of their office, employment and agency, Defendant RGC caused Decedent's arrest, detention, torture, and ultimately his execution.

50. **Defendant Ali Akbar Hashemi-Rafsanjani** was, at all times relevant hereto, the president of Defendant Islamic Republic Of Iran. Within the scope of his office, employment and agency, Defendant Ali Akbar Hashemi-Rafsanjani performed actions, or authorized actions, which caused Decedent's arrest, detention, torture, and ultimately, his execution.

51. **Defendant Ali Fallahian-Khuzestani** was at all times relevant hereto the Minister of Information and Security for defendant Iran. Within the scope of his office, employment and agency, Ali Fallahian-Khuzestani performed actions which caused Decedent's arrest, detention, torture, and ultimately his execution.

52. Defendant Ayatollah Ali Khamenei is the Supreme Leader of the Islamic Republic of Iran. Within the scope of his office, employment and agency, Defendant Ayatollah Ali Khamenei performed actions, or authorized actions, which has prevented the

arrest and prosecution of those individuals and agencies which caused Decedent's arrest, detention, torture, and ultimately, his execution.

53. **Defendants Individual John Does** are agents of the Islamic Republic of Iran who directly carried out the orders of Defendant Agents in effecting the imprisonment, torture and execution of Plaintiff Siavash Bayani.

## III.
## JURISDICTION AND VENUE

### A. Jurisdiction

54. Subject matter jurisdiction arises in this Court pursuant to an exception to the Foreign Sovereign Immunities Act, 28 U.S.C. §§1602-1611, et seq., which exception was created as to Foreign States sponsoring terrorism in the Antiterrorism and Effective Death Penalty Act of 1996. See 28 U.S.C. §1605(a)(7) and 28 U.S.C. §1605, note.

55. The Secretary of State of the United States designated Defendant, Republic of Iran, as a state sponsor of terrorism pursuant to §6(g) of the Export Administration Act of 1979 on September 13, 1990. (55 Fed. Reg. 37793-01).

56. Defendants have been sent an offer to arbitrate this claim in compliance with 8 U.S.C. §§1605(a)(7)(B)(i).

### B. Venue

57. Venue is proper in the U.S. District Court for the District of Columbia, because the nearest agent for service of process on the Government of Iran is located in Washington, D.C.

Service can be effected by registered mail or on the United States Department of State for diplomatic service on Defendant in accordance with 28 U.S.C. §1608(A)(4), as well as on the Iranian Interests Section, in care of the Embassy of Pakistan, 2209 Wisconsin Avenue, N.W. Washington, D.C. 20007.

58. Venue is also proper in this jurisdiction for litigation under the Antiterrorism and Effective Death Penalty Act of 1996.

59. Additional points which establish proper venue are:

a. Deceased was a citizen of the United States at the time of his detention, torture and execution at the hands of Defendants.
b. Defendant Islamic Republic of Iran is a sovereign state, and the other named Defendants acted under color of authority of the government of Iran.
c. This Controversy exceeds $75,000.00.
d. The family of Decedent are U.S. Citizens and have been irreparably harmed by the torture and murder of Decedent.

## IV. ALLEGATIONS

For their complaint, and based on information and belief, Plaintiffs set forth the following allegations:

60. The acts described herein against Decedent Bayani were committed by agents, officials and employees of the Islamic Republic of Iran.

61. At all relevant times, Defendant Islamic Republic of Iran was responsible for, and sanctioned through its authority as a sovereign nation, the actions taken by the other defendants in ordering the arrest, imprisonment, torture and execution of Decedent Siavash Bayani.

62. At all relevant times, Defendants Rafsanjani, Fallahian, and Does 1-10, acting in their official capacity, planned, instigated, ordered, authorized or incited agents, officials and employees of Defendant Islamic Republic of Iran in the arrest, imprisonment, torture and execution of Decedent Siavash Bayani.

63. At all relevant times, Defendants Rafsanjani, Fallahian, and Does 1-10, were vested by Defendant Islamic Republic of Iran with authority over the agencies and their instrumentalities which ordered, authorized or incited agents, officials and employees of Defendant Islamic Republic of Iran in the arrest, imprisonment, torture, and execution of Decedent Siavash Bayani.

64. At all relevant times, Defendants Rafsanjani, Fallahian, and Does 1-10, were aware of, or consciously disregarded, the fact that these agents and instrumentalities of Defendant Islamic Republic of Iran over which they had authority, were carrying out the arrest, detention, torture and execution of Iranian-born U.S. citizens, including

Decedent Siavash Bayani, based on fabricated charges of espionage and other acts against the Islamic Republic of Iran.

65. At all relevant times, Defendants Rafsanjani, Fallahian, and Does 1-10, failed to take the necessary and reasonable measures to prevent or investigate the arrest, detention, torture and execution of Iranian-born U.S. citizens, including Decedent Siavash Bayani, based on fabricated charges of espionage and other acts against the Islamic Republic of Iran.

**Count 1.**
(Torture - Against All Defendants)

66. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

67. The named Defendants in this action are responsible for committing numerous acts of torture upon Plaintiff Siavash Bayani during his period of imprisonment, ultimately leading to his execution at the hands of Defendants.

**Count 2.**
(Murder - Against All Defendants)

68. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

69. The named Defendants in this action are responsible for the murder of Plaintiff Siavash Bayani under the color of a state-sponsored execution based on a knowingly false allegation of espionage.

**Count 3.**
(Assault - Against All Defendants)

70. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

71. The named Defendants in this action are responsible for numerous acts of assault upon Decedent Siavash Bayani during his arrest, imprisonment, and torture.

**Count 4.**
(Battery - Against All Defendants)

72. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

73. The named Defendants in this action are responsible for numerous acts of battery upon Decedent Siavash Bayani during his arrest, imprisonment, and torture.

**Count 5.**
(False Imprisonment - Against All Defendants)

74. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

75. The named Defendants in this action are responsible for the false imprisonment of Decedent Siavash Bayani based on knowingly false allegations of espionage.

**Count 6.**
(Loss Of Solatium - Against All Defendants)

76. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

77. The named Defendants in this action are responsible for the numerous acts which ended in the execution of Decedent Siavash Bayani.

78. Plaintiffs are entitled to recover for the loss of a decedent's companionship, inflicted upon Decedent at the hands of Defendants.

**Count 7.**
(Intentional Infliction Of Emotional Distress - Against All Defendants)

79. Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully restated herein.

80. The named Defendants in this action are responsible for the acts described above, and Plaintiffs are entitled to recover for the mental anguish from the loss of a decedent, inflicted upon them at the hands of the named Defendants.

## V.
## Prayer For Relief

81. The Antiterrorism and Effective Death Penalty Act enables suits for monetary damages against foreign states for "money damages which may include economic damages, solatium, pain and suffering, and punitive damages if the acts were among those described in 28 U.S.C. §1605(a)(7)." *See also* 28 U.S.C. §1605, note.

82. Plaintiffs herein respectfully request that this Court grant judgments against Defendants, jointly and severally, for the following:

1. For Compensatory damages, in an amount not less that $150 million.
2. For reasonable attorneys' fees ad costs of suit, according to offered proof; and
3. For all such other relief as the court may deem just and proper.

## VI.
## Request for Punitive Damages

80. In addition to the prayers for relief, the FSIA has been interpreted to allow the recovery of punitive damages from state agents, agencies, as well as from the sovereign state itself. Section 1603(b) provides that

> "[a]n 'agency or instrumentality of a foreign state' means any entity—
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country. 28 U.S.C. § 1603(b).

Plaintiffs, jointly and severally, hereby seek punitive damages against Defendants in an amount not less than $300 million

**WHEREFORE**, Plaintiffs herein respectfully request that this Court grant judgments against Defendants, jointly and severally, for the following:

1. For Compensatory damages, in an amount not less that $150 million.
2. For punitive damages, in an amount not less than $300 million
3. For reasonable attorneys' fees ad costs of suit, according to offered proof; and
4. For all such other relief as the court may deem just and proper.

Date: ___________________

Respectfully submitted,

By:

_____________________________

Zohreh Mizrahi
U.S.D.C.D.C. Bar No. TX0024
2049 Century Park East
Suite 2680
Los Angeles, CA 90067
Phone: (310) 843-9494
Fax: (310) 843-9777